1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

VALERIY VICTOROVICH EKUBOV,

          Plaintiff,

   v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY et al.,

          Defendant.

Case No. C20-1104-TL-SKV

REPORT AND RECOMMENDATION

## I.    <u>INTRODUCTION</u>

Petitioner Valeriy Victorovich Ekubov is a citizen and national of Russia who petitions the Court under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1421(c), for *de novo* review of Respondent United States Citizenship and Immigration Service's ("USCIS") denial of his application for naturalization. Dkt. 5. Specifically, Petitioner challenges USCIS's determination that (1) he was not lawfully admitted to the United States for permanent residence, and is thus not eligible for citizenship, and (2) such an ineligibility determination cannot be remedied by *nunc pro tunc* relief. *Id.* at ¶ 1. Petitioner asks this Court to find that he was lawfully admitted for permanent residence, or alternatively, to grant him *nunc pro tunc* relief,

thereby finding him eligible for naturalization.  *Id.*  USCIS[1] moves the Court on summary judgment for an order denying Petitioner's application for naturalization on the grounds that (1) Petitioner was not lawfully admitted for permanent residence, and (2) *nunc pro tunc* relief is unavailable to him.  Dkt. 17.

Having thoroughly considered the parties' briefing and the relevant record, the Court hereby finds that USCIS's Motion should be GRANTED because (1) Petitioner's permanent residence was not granted in accordance with the INA's requirements, meaning he was not lawfully admitted for permanent residence to the United States and is therefore ineligible for citizenship, and (2) because Petitioner failed to maintain his F-1 student status in accordance with applicable law, he failed to continuously maintain lawful status during the entirety of his time in the United States and was in unlawful immigration status when he filed his application for permanent residence.

## II.    BACKGROUND

Petitioner, born in 1987, is a citizen and national of Russia and a lawful permanent resident of the United States who currently resides in Mukilteo, Washington.  Dkt. 5 ¶¶ 5, 12. USCIS is a division of the United States Department of Homeland Security and is the federal agency responsible for adjudicating naturalization applications.  *Id.* at ¶ 6.

Petitioner first came to the United States on a B-2 nonimmigrant visitor visa on March 1, 2006, with authorization to remain in the country until August 28, 2006.  Dkt. 5 ¶ 12.  On July 27, 2006, Petitioner completed a Form I-20, Certificate of Eligibility for Nonimmigrant (F-1)

---

[1] This Motion is brought on behalf of all federal Respondents; however, the Court refers to the moving parties as USCIS herein.

Student Status, which indicated he intended to enroll as a student in Daytona Beach Community

College ("Daytona College").[2]  Dkt. 18-2 at 62.

Subsequently, on August 3, 2006, Petitioner filed a Form I-539, Application to

Extend/Change Nonimmigrant Status, with USCIS requesting to change his status from that of a

B-2 visitor to that of a F-1 student.  Dkt. 5 ¶ 13.  On November 6, 2006, USCIS approved

Petitioner's change of status request, thereby changing Petitioner's status to that of a F-1 student

for the duration of the status.  *Id.*  As a condition of his F-1 student status, Petitioner was to

attend Daytona College full-time and to complete his studies by August 23, 2008.  Dkt. 18-2 at

62.

It is undisputed that Petitioner failed to abide by these requirements.  He did not attend

school during two school sessions, Dkt. 18-2 at 21:8–22:13, 49, 53, 63–64, did not consistently

carry a full caseload, *id.* at 22:25–24:5, and did not receive permission to carry a reduced

caseload, *id.* at 25:20–26:14.  Further, Petitioner did not complete his studies by August 23,

2008.  *Id.* at 8:25–9:4, 27:8–28:9.  Instead, he completed them on December 15, 2017, without

first receiving permission to extend his studies.  *Id.* at 27:23–28:22, 56.

On April 2, 2007, Petitioner's stepfather, a U.S. citizen, filed a Form I-130, Petition for

Alien Relative, seeking to classify Petitioner as his stepchild.  Dkt. 5 ¶ 14.  That same day,

Petitioner filed a Form I-485, Application to Register Permanent Residence or Adjust Status,

seeking to adjust his status to that of a lawful permanent resident.  Dkt. 18-1 at 11.  On August 8,

2007, both the Form I-130 and the Form I-485 were denied, the former because Petitioner and

his stepfather failed to appear for an interview, and the latter because Petitioner did not have the

requisite visa.  *Id.*  Petitioner's stepfather subsequently reopened the Form I-130; however, on

---

[2] Daytona Beach Community College subsequently became Daytona State College.  Dkt. 18-2 at
16:12–18.

August 29, 2007, the Form I-130 was again denied because Petitioner, who was 19 years old when his mother and stepfather married, failed to meet the INA's definition of "stepchild." *Id.*; 8 U.S.C. § 1101(b)(1)(B) (defining "stepchild" as a child "who has not reached the age of eighteen at the time the marriage creating the status of stepchild occurred"). Six days prior, on August 23, 2007, Petitioner's F-1 student status was terminated in the Student and Exchange Visitor Information System ("SEVIS"), Dkt. 5 ¶ 15; Dkt. 18-1 at 15, a "web-based system for maintaining information on nonimmigrant students and exchange visitors in the United States[,]" *Student and Exchange Visitor Program*, U.S. Immigration and Customs Enforcement, https//www.ice.gov/sevis (last visited June 1, 2022). The reason provided in SEVIS for the termination was that "student applied for a change of status to permanent resident and requested deactivation of his present F-1 status." Dkt. 18-1 at 15.

On January 10, 2008, Petitioner's mother filed a Form I-130, seeking to classify Petitioner as an unmarried child under 21 years of age of a permanent resident. Dkt. 5 ¶ 16. This placed Petitioner in the family second preference A (F2-A) category to obtain an immigrant visa, and the Form I-130 was given a priority date of October 11, 2007. Dkt. 18-1 at 6, 11. Shortly thereafter, Petitioner turned 21, and his category was converted to the family second preference B (F2-B) category for an unmarried child over the age of 21 of a lawful permanent resident. *Id.* at 11. On April 14, 2008, the Form I-130 filed by Petitioner's mother was approved. *Id.*

On January 7, 2011, Petitioner's mother became a naturalized U.S. citizen, and Petitioner's preference category automatically converted to the family first preference (F1) category for an unmarried child of a U.S. citizen. Dkt. 18-1 at 11. On July 1, 2011, Petitioner

1    filed a second Form I-485, seeking to adjust his status to that of a lawful permanent resident.

2    Dkt. 5 ¶ 18.

3        Subsequently, on August 29, 2011, USCIS sent Petitioner a notice informing him that

4    while his preference category had been automatically converted to the F1 (family first

5    preference) category, visa numbers for that category were "much more backlogged than visa

6    numbers for the family second preference category. . . ." Dkt. 18-1 at 18.  The notice further

7    informed Petitioner that he could "opt-out" of the automatic conversion to the F1 category, and

8    instead adjust his status immediately, as there were "visas available in the family second

9    preference category based on [Petitioner's] priority date." *Id.*   Notably, the notice erroneously

10   indicated that when Petitioner's Form I-130 was approved, he was an unmarried child under the

11   age of 21 of a legal permanent resident, and thus in the F2-A preference category, *id.*, when in

12   fact he was an unmarried child over the age of 21 and in the F2-B preference category.

13       On September 1, 2011, Petitioner responded to the notice, informing USCIS that he

14   would "exercise the 'opt out' provision and stay under the second preference category

15   (unmarried child under [the] age of 21 of a legal permanent resident)." Dkt. 18-1 at 20.  USCIS

16   approved Petitioner's Form I-485 on September 13, 2011, and Petitioner was granted lawful

17   permanent residency, receiving a FX7 visa under the F2-A preference category.  *Id.* at 6.

18       On February 5, 2017, Petitioner filed a Form N-400, Application for Naturalization, and

19   subsequently appeared for an interview with an Immigration Services Officer on February 15,

20   2018. Dkt. 18-1 at 11.  In conjunction with his Form N-400 application, USCIS reviewed the

21   entirety of Petitioner's immigration history, ultimately determining that Petitioner's adjustment

22   of status to legal permanent resident on September 13, 2011, was unlawful.  *Id.*

23

In a Notice of Intent to Deny ("NOID") Petitioner's Form N-400 application, dated March 28, 2018, USCIS explained the grounds for denial as follows:

> When your mother became a naturalized citizen on January 7, 2011 you were automatically converted into the family-sponsored preference category F1, Unmarried sons and Daughters of a U.S. Citizen . . . . [Y]ou were therefore eligible to "opt-out" from this automatic conversion to the category F1 and remain in the family-sponsored preference category F2B, unmarried sons and daughters of permanent residence [sic]. However, you were not eligible to "opt-out" form [sic] this automatic conversion to F1 and remain in the family-sponsored preference category F2A, spouses and children of permanent residents . . . . Section 101(B)(1) of the Immigration and Nationality Act defines child as "an unmarried person under twenty-one years of age," and you were over the age of 21 in 2011.

Dkt. 18-1 at 6–7.

The NOID further explained that when Petitioner filed his Form I-485 in July 2011, visas were available based on the following priority dates: for the F1 category, a priority date of May 1, 2004; for the F2-A category, a priority date of March 22, 2008; and for the F2-B category, a priority date of July 1, 2003. Dkt. 18-1 at 7. While the priority date for the Form I-130 filed by Petitioner's mother on January 10, 2008, was October 11, 2007, meaning Petitioner would have been eligible for a visa if he were a member of the F2-A preference category, he was only eligible for membership in the F1 or F2-B preference categories. *Id.* And no visas were available based on Petitioner's priority date in either of those categories at the time of his application in July 2011, or at the time of his adjustment of status in September 2011. *Id.* The NOID acknowledged that "USCIS incorrectly adjusted [Petitioner's] status to that of a FX7 or F2A." *Id.*

Finally, the NOID explained that under the INA, "no person shall be naturalized unless he has been lawfully admitted to the United States for permanent residence in accordance with all applicable provisions" of the INA, and because it did not appear that Petitioner had been lawfully admitted for permanent residence, he was not eligible for naturalization. Dkt. 18-1 at 7.

The NOID gave Petitioner 30 days to submit evidence or a rebuttal showing he could "overcome that [he was] not lawfully admitted as a lawful permanent resident."  *Id.*

On May 7, 2018, Petitioner responded to the NOID, urging USCIS to "utilize the doctrines of collateral estoppel and *nunc pro tunc* in his case," as failure to do so would "result in an injustice by the government's own failure."  Dkt. 5 ¶ 20.

Subsequently, on April 15, 2019, USCIS denied Petitioner's Form N-400 application for the same reasons set forth in the NOID.  Dkt. 18-1 at 10–13.  USCIS also noted that records showed that Petitioner's F-1 student status had been terminated on August 23, 2007, and Petitioner had provided no evidence indicating he was in possession of another nonimmigrant visa at the time of his adjustment of status to lawful permanent resident.  *Id.* at 12.  Per USCIS, this meant that Petitioner was inadmissible to the United States at the time of his adjustment as a "nonimmigrant without a valid visa."  *Id.*

On May 22, 2019, Petitioner appealed USCIS's decision and appeared for a hearing on January 21, 2020.  Dkt. 5 ¶ 22.  USCIS affirmed its denial of Petitioner's naturalization application on April 6, 2020, incorporating the discussion from the Form N-400 denial into its decision.  Dkt. 18-1 at 22–24.  USCIS reiterated that Petitioner had not demonstrated that he was admitted for permanent residence "in accordance with the immigration laws" because those laws require a visa to be available to an applicant at the time he applies to adjust his status, and at the time his application is approved.  *Id.* at 23.  USCIS further explained that an applicant must also otherwise be admissible for permanent residence in the United States, and because Petitioner did not hold "current nonimmigrant status at the time that [he] filed his Form I-485," he "would have been inadmissible for permanent residence regardless."  *Id.*

On July 20, 2020, Petitioner filed a Petition for *De Novo* Review of Denial of Application for Naturalization and Request for Hearing Pursuant to 8 U.S.C. § 1421(c) in this Court. *See* Dkt. 5. At the same time, Petitioner filed a Memorandum in Support of Petition for Review. *See* Dkt. 5-1.

### III.    DISCUSSION

#### A.    Legal Standard

Summary judgment is appropriate if there is no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where, as here, the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by demonstrating that there is an absence of evidence to support the nonmoving party's case. *Id.* at 325.

If the moving party meets the initial burden, the opposing party must set forth specific facts showing that there is a genuine issue of fact for trial in order to defeat the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48 (emphasis in original). "In other words, 'summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor.'" *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001) (citation omitted). The Court views the evidence and inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

B.    Lawfully Admitted for Permanent Residence

USCIS moves the Court for an order finding, as a matter of law, that Petitioner was not lawfully admitted for permanent residence, and is therefore ineligible for naturalization.  Dkt. 17 at 12–14.

The INA sets forth the requirements for naturalization.  *See* 8 U.S.C. § 1427.  One such requirement is that an applicant demonstrate that he was "lawfully admitted for permanent residence" in accordance with all applicable provisions of the INA.  8 U.S.C. §§ 1427(a), 1429. "The term 'lawfully admitted for permanent residence' means the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status having not changed."  8 U.S.C. § 1101(a)(20). USCIS has the discretion to adjust the status of an applicant to that of a person "lawfully admitted for permanent residence" if the applicant (1) "makes an application for such adjustment," (2) establishes that he "is eligible to receive an immigrant visa and is admissible to the United States for permanent residence," and (3) "an immigrant visa is immediately available to him at the time his application is filed."  8 U.S.C. § 1255(a).  An applicant "who is in unlawful immigration status on the date of filing the application for adjustment of status or who has failed (other than through no fault of his own or for technical reasons) to maintain continuously a lawful status since entry into the United States" is not admissible for permanent residence.  8 U.S.C. § 1255(c)(2).  The burden of proof is on the applicant to show that he entered the United States lawfully.  8 U.S.C. § 1429.

USCIS erroneously adjusted Petitioner's status to that of lawful permanent resident on September 13, 2011, based on his assignment to the wrong visa preference category—category F2-A.  Dkt. 18-1 at 6–7, 11–12.  Thereafter, USCIS denied Petitioner's application for

1   naturalization on the ground that Petitioner could not show that this adjustment was lawful—

2   specifically, because no immigrant visa was actually available to him under either of the possibly

3   applicable visa preference categories—categories F1 and F2-B—when he filed his Form I-485

4   application for adjustment of status in July 2011, or when USCIS approved his adjustment of

5   status in September 2011. *Id.* at 6–7, 11–12. USCIS further found that even if an immigrant visa

6   had been available to Petitioner under either category, he still would have been inadmissible for

7   permanent residence because at the time he filed his Form I-485 application in July 2011,

8   Petitioner did not hold current nonimmigrant status, as his F-1 nonimmigrant student status had

9   been terminated. *Id.* at 12, 23. Thus, because Petitioner was not lawfully admitted for

10  permanent residence in accordance with the INA, he was not eligible for naturalization.

11      Petitioner does not dispute that USCIS erroneously adjusted his status to lawful

12  permanent resident, nor does he dispute that USCIS subsequently applied the correct visa

13  preference categories when finding there were no visas available to Petitioner. Indeed, Petitioner

14  concedes as much, noting that his lawful permanent resident status was granted "mistakenly,"

15  Dkt. 5-1 at 4, 5, and that "an immigrant visa was not available to him at the time his adjustment

16  of status application was adjudicated," Dkt. 19 at 3. Instead, Petitioner argues that USCIS

17  cannot rescind his lawful permanent resident status because the five-year statute of limitations

18  for doing so has run. Dkt. 5-1 at 5 (citing 8 U.S.C. 1256(a)). While it may be true that

19  Petitioner's lawful permanent resident status cannot now be rescinded, this does not change the

20  fact that that status cannot be used to support Petitioner's claim to citizenship because it was not

21  granted in accordance with statutory requirements.

22      Citing *Agarwal v. Napolitano*, 663 F. Supp. 2d 528, 537–38 (W.D. Tex. 2009), Petitioner

23  further argues that "courts have found that even where [lawful permanent resident] status has

been incorrectly granted, a Petitioner may still have [lawful permanent resident] status and not be foreclosed from naturalizing." Dkt. 5-1 at 5.  But in *Argwall*, the court's analysis focused on whether the plaintiffs' allegedly erroneous lawful permanent resident status was "void from the start," *Agarwal*, 663 F. Supp. 2d at 539, not whether erroneously granted lawful permanent resident status satisfies the definition of "lawfully admitted for permanent residence" under the INA.  *See* 8 U.S.C. 1101(a)(20).

There is no inherent tension "between admitting that an individual was granted [lawful permanent resident] status and challenging the lawfulness of that admission." *Turfah v. United States Citizenship & Immigration Servs.*, 2:15-CV-10371, 2016 WL 362456, at *3 (E.D. Mich. Jan. 29, 2016), *aff'd*, 845 F.3d 668 (6th Cir. 2017).  In *Monet v. I.N.S.*, 791 F.2d 752, 753 (9th Cir. 1986), a removal case, the Ninth Circuit held that a lawful permanent resident, who had obtained that status by concealing a prior drug conviction, did not qualify as "lawfully admitted for permanent residence" under 8 U.S.C. § 1101(a)(20) because "lawfully admitted" requires compliance with substantive legal requirements.  "Admission is not lawful if it is regular only in form.  The term 'lawfully' denotes compliance with substantive legal requirements, not mere procedural regularity." *Id.* (citation omitted).  *See also Segura v. Holder*, 605 F.3d 1063, 1067 (9th Cir. 2010) (emphasizing "the necessity of actually complying with the substantive elements of the admission requirements").

Courts hold the same in the naturalization context.  *See, e.g.*, *Saliba v. Attorney Gen. of United States*, 828 F.3d 182, 196 (3d Cir. 2016) (holding that "an alien who becomes a [lawful permanent resident] despite being 'inadmissible' has not been 'lawfully admitted' for permanent residence" for the purpose of naturalization); *Injeti v. U.S. Citizenship & Immigration Servs.*, 737 F.3d 311, 318 (4th Cir. 2013) ("[W]e find that Injeti failed to show that she was 'legally entitled'

to the grant of [the lawful permanent resident] status she received, and conclude that she was not lawfully admitted for permanent residence.  Injeti is therefore ineligible for naturalization . . . .").

And even when a person gains lawful permanent resident status due to a mistake by the government, courts hold that he is "not lawfully admitted for permanent residence," as required to establish eligibility for naturalization.  *See, e.g.*, *Turfah v. United States Citizenship & Immigration Servs.*, 845 F.3d 668, 672–73 (6th Cir. 2017) (finding that a person is not "lawfully admitted for permanent residence" if he gains lawful permanent resident status due to a mistake by the government, even if he did not commit any fraud in obtaining that status); *Ghazavi v. Campagnolo*, No. 19-1813-SVW-ADS, 2020 WL 6259997, at * 2–4 (C.D. Cal. Sept. 8, 2020) (finding the plaintiff was "not lawfully admitted for permanent residence" when he was erroneously granted lawful permanent resident status before he was eligible due to a government mistake); *Ayala v. USCIS*, No. 16-0798-AWI BAM, 2017 WL 3023572, at *5 (E.D. Cal. July 17, 2017) ("Even if the plaintiff obtained her [lawful permanent resident] status by the government's mistake, and no fraud was involved, the plaintiff is still not 'lawfully admitted for permanent residence.'").

Here, Petitioner has failed to demonstrate that he complied with the substantive legal requirements for obtaining lawful permanent resident status.  In order to be eligible for such status, a visa needed to be "immediately available to [Petitioner]."  8 U.S.C. § 1255(a).  It is undisputed that no visa was available to him in either of the proper preference categories at the time he submitted his Form I-485 application in July 2011, or at the time his status was adjusted to that of lawful permanent resident in September 2011.  Thus, Petitioner was not "lawfully admitted for permanent residence" in accordance with the INA's requirements.

1    Moreover, Petitioner was ineligible for lawful permanent resident status under 8 U.S.C.

2    § 1255(c) because he was in unlawful immigration status when he filed his Form I-485

3    application in July 2011, and he failed to continuously maintain lawful status during the duration

4    of his time in the United States.  As indicated, Petitioner's F-1 student status was terminated in

5    August 2007, Dkt. 18-1 at 15—four years before Petitioner submitted the Form I-485 application

6    at issue—and Petitioner has come forth with no evidence indicating he otherwise possessed

7    lawful status.

8    Petitioner argues it is "far from resolved" whether his F-1 student status was properly

9    terminated by USCIS in the first place.  Dkt. 19 at 5.  The record does not support this

10   contention.  As a preliminary matter, Petitioner acknowledges in his Petition that his F-1 student

11   status was terminated.  *See* Dkt. 5 ¶ 15 ("On August 23, 2007, [Petitioner's] Student and

12   Exchange Visitor Program (SEVIS) status for his F-1 student visa was terminated. The reason

13   for the termination was 'authorized early withdrawal.'").  "Factual assertions in pleadings and

14   pretrial orders, unless amended, are considered judicial admissions conclusively binding on the

15   party who made them."  *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988).

16   Petitioner now contends that notes written by the USCIS officer who adjudicated his

17   Form N-400 naturalization application indicate that Petitioner's F-1 student status was never

18   terminated,  Dkt. 19 at 2; however, the evidence Petitioner provides in support of this contention

19   is not authenticated, and the Court cannot discern its author or adequately interpret its contents.

20   *See* Dkt. 19-2 at 2.  Petitioner further contends that USCIS itself was unaware of the alleged

21   termination until after Petitioner applied for naturalization.  Dkt. 19 at 2.  Petitioner provides no

22   evidence to support this contention.  Further, USCIS's affirmative knowledge of the termination

23   is immaterial to whether the termination occurred.  And while Petitioner denies asking Daytona

1    College to terminate his F-1 student status and points to evidence indicating a USCIS officer

2    acknowledged his denial, *id.*, this too is immaterial to whether Petitioner's student status was

3    actually terminated.

4        Petitioner contends that "[a]n argument could also be made that Petitioner failed to

5    maintain status through no fault of his own or for technical reasons[,]" Dkt. 19 at 6, thereby

6    excepting him from § 1255(c)'s applicability.  *See* 8 U.S.C. § 1255(c)(2) (providing that an

7    applicant "who is in unlawful immigration status on the date of filing the application for

8    adjustment of status or who has failed (*other than through no fault of his own or for technical*

9    *reasons*) to maintain continuously a lawful status since entry into the United States" is not

10   admissible for permanent residence) (emphasis added).  Specifically, Petitioner argues Daytona

11   College did not follow proper recordkeeping and reporting regulations when terminating his

12   student status.  Dkt. 19 at 2–3.  But even assuming this is true, Petitioner himself failed to

13   continuously maintain lawful status during the duration of his time in the United States, in

14   contravention of applicable law.

15       Petitioner's F-1 student status was only valid for the duration of the status.  Dkt. 5 ¶ 13;

16   Dkt. 18-1 at 11; 8 C.F.R. § 214.2(f)(5)(i).  Applicable regulations define "duration of status" as

17   "the time during which an F-1 student is pursuing a full course of study at an educational

18   institution approved by the Service. . . . The student is considered to be maintaining status if he

19   or she is making normal progress toward completing a course of study."  *See* 8 C.F.R.

20   § 214.2(f)(5)(i).  A school "may allow an F-1 student to engage in less than a full course of

21   study"; however, "[a] student who drops below a full course of study without the prior approval

22   of the DSO will be considered out of status."  8 C.F.R. § 214.2(f)(6)(iii).  It is undisputed that

23   Petitioner did not attend school during two school sessions, Dkt. 18-2 at 21:8–22:13, 49, 53, 63–

64, did not consistently carry a full caseload, *id.* at 22:25–24:5, and did not receive permission to carry a reduced caseload, *id.* at 25:20–26:14.

Moreover, applicable regulations require "[a]n F-1 student who is currently maintaining status and making normal progress toward completing his or her educational objective, but who is unable to complete his or her course of study by the program end on the Form I-20, [to] apply prior to the program end date for a program extension . . . ." 8 C.F.R. § 214.2(f)(7)(i). It is undisputed that Petitioner did not complete his studies within the prescribed time, i.e., by August 23, 2008, and that he did not receive permission to extend his studies. Dkt. 18-2 at 8:25–9:4, 27:8–28:22, 56.

Finally, it is undisputed that Daytona College provided Petitioner with information and training about maintaining his student status, *see generally* Dkt. 18-3, and Petitioner acknowledges that he understood he was to attend school full-time, and that he had an obligation to know his status and understand his obligations for maintaining that status, Dkt. 18-2 at 26:22–27:22, 40:19–41:1.

Thus, there is no genuine dispute as to whether Petitioner failed to maintain his F-1 student status, contrary to applicable law, nor as to whether this failure was through no fault of his own or for technical reasons. As such, Petitioner was out of status and ineligible for adjustment to lawful permanent resident under 8 U.S.C. § 1255(c), regardless of whether his F-1 student status was properly terminated in SEVIS. USCIS's Motion should be granted.

C.    *Nunc Pro Tunc* Relief

Petitioner asks the Court to grant him relief in the form of a *nunc pro tunc* adjustment of status back to the first month that an immigrant visa was available for the F2-B preference category. Dkt. 5 ¶ 35. Petitioner acknowledges that in order for this adjustment to take place

1    and for Petitioner to qualify as a lawfully admitted permanent resident, the Court must also

2    reinstate Petitioner's F-1 student status.  *Id.* ("If the Court can adjust Petitioner's application *nun*

3    *pro tunc* by retroactively adjusting his status to October 2014, when a visa was available to him,

4    under the F2B category, while also reinstating his F-1 status, then a finding that Petitioner did, in

5    fact, meet all the requirements to achieve permanent resident status would neither change nor

6    ignore explicit statutory provisions."); *see also* Dkt. 5-1 at 9.

7        Respondent moves the Court for an order holding that neither *nunc pro tunc* relief, nor

8    any other kind of equitable remedy, is available to Petitioner.  Dkt. 17 at 14–19.

9        *Nunc pro tunc*, meaning "now for then," is an equitable remedy used by courts and

10   administrative bodies to "return aliens to the position in which they would have been, but for a

11   significant error in their immigration proceedings."  *Edwards v. I.N.S.*, 393 F.3d 299, 308–09 (2d

12   Cir. 2004) (citing *Batanic v. INS*, 12 F.3d 662, 667 (7th Cir. 1993); *Castillo–Perez v. INS*, 212

13   F.3d 518, 528 (9th Cir. 2000)).  When a matter is adjudicated *nunc pro tunc*, "it is as if it were

14   done as of the time that it should have been done."  *Id.* at 308.  *Nunc pro tunc* relief is

15   appropriate "where an agency error would otherwise be irremediable, and where the plaintiff has

16   been deprived of a significant benefit," *id.* at 310, as well as where "the grant would effect a

17   complete disposition of the case . . . ."  *In Re Garcia-Linares*, 21 I. & N. Dec. 254, 257 (BIA

18   1996).

19        However, while courts can apply *nunc pro tunc* and other equitable relief, "the power to

20   make someone a citizen of the United States has not been conferred upon the federal courts . . .

21   as one of their generally applicable equitable powers."  *INS v. Pangilinan*, 486 U.S. 875, 883–84

22   (1988).  Rather, the Constitution confers on Congress exclusive authority to establish rules of

23   naturalization, and the federal courts have the power to make someone a citizen of the United

1    States only in "strict compliance" with the terms established by Congress.  *Id.* at 882–84.

2    "'Once it has been determined that a person does not qualify for citizenship, . . . the [federal]

3    court has no discretion to ignore the defect and grant citizenship.'"  *Id.* at 884 (quoting

4    *Fedorenko v. United States*, 449 U.S. 490, 517 (1981)).  "Neither by application of the doctrine

5    of estoppel, nor by invocation of equitable powers, nor by any other means does a court have the

6    power to confer citizenship in violation of the[ ] limitations [established by Congress]."  *Id.* at

7    885.

8        This means that the Court lacks the authority to exercise its equitable powers—*nunc pro*

9    *tunc* or otherwise—to convey citizenship where the statutory requirements for naturalization

10   have not been met.  *Pangilinan*, 486 U.S. at 883–85.  That being said, a court may grant

11   citizenship to an applicant who has not fulfilled the requirements of the INA if the applicant "can

12   show that the denial of his claim for citizenship has violated his constitutional rights."  *Brown v.*

13   *Holder*, 763 F.3d 1141, 1147 (9th Cir. 2014).  *See also Wauchope v. U.S. Dep't of State*, 985

14   F.2d 1407, 1416–19 (9th Cir. 1993) (overruled on other grounds); *Pangilinan*, 486 U.S. at 883–

15   85.

16       As discussed above in Section III.B, Petitioner has not met the statutory requirements for

17   naturalization because he was not lawfully admitted for permanent residence.  Even if the Court

18   were to equitably adjust Petitioner's status back to the first month in which an immigrant visa

19   was available to him in either the F1 or F2-B categories, Petitioner would still be ineligible for

20   lawful permanent resident status (and thus for naturalization) under 8 U.S.C. § 1255(c) because

21   he was in unlawful immigration status when he filed his Form I-485 application in July 2011,

22   and he failed to continuously maintain lawful status during the duration of his time in the United

23   States.

1    Moreover, Petitioner is not entitled to reinstatement of his F-1 student status.  Under 8

2    C.F.R. 214.2(f)(16), USCIS can grant a student's request for reinstatement of student status if the

3    student:

> (A) Has not been out of status for more than 5 months at the time of filing the request for reinstatement (or demonstrates that the failure to file within the 5 month period was the result of exceptional circumstances and that the student filed the request for reinstatement as promptly as possible under these exceptional circumstances); (B) Does not have a record of repeated or willful violations of Service regulations; (C) Is currently pursuing, or intending to pursue, a full course of study in the immediate future at the school which issued the Form I-20; (D) Has not engaged in unauthorized employment; (E) Is not deportable on any ground other than section 237(a)(1)(B) or (C)(i) of the Act; and (F) Establishes to the satisfaction of the Service, by a detailed showing, either that: (1) The violation of status resulted from circumstances beyond the student's control. Such circumstances might include serious injury or illness, closure of the institution, a natural disaster, or inadvertence, oversight, or neglect on the part of the DSO, but do not include instances where a pattern of repeated violations or where a willful failure on the part of the student resulted in the need for reinstatement; or (2) The violation relates to a reduction in the student's course load that would have been within a DSO's power to authorize, and that failure to approve reinstatement would result in extreme hardship to the student.

8 C.F.R. 214.2(f)(16)(i).

Petitioner cannot demonstrate that he meets the standard for reinstatement because, at a

minimum, he has not shown that his violation of status resulted from circumstances beyond his

control, nor has he shown that the violation solely related to a reduction in his course load that

would have been within USCIS's power to authorize.  *See* 8 C.F.R. 214.2(f)(16)(i)(F).

While Petitioner contends that his violation of status resulted from the fact that he did not

have the paperwork outlining his F-1 student obligations in his possession, he acknowledges that

he could have asked for copies of the paperwork, Dkt. 18-2 at 28:24–30:7, and states that he does

not blame the government for his failure to consistently attend school full-time and carry a full

caseload, or for his failure to complete his studies by the requisite program completion date, *id.*

at 30:8–15.  Nor does Petitioner contend any other external forces—such as "serious injury or

illness, closure of the institution, a natural disaster, or inadvertence, oversight, or neglect on the part of the DSO," 8 C.F.R. 214.2(f)(16)(i)(F)(1)—prevented him from complying with his F-1 student obligations.  Thus, there is no genuine dispute as to whether Petitioner's failure to maintain his student status was due to "circumstances beyond his control."  *Id.*  It was not.

Further, Petitioner's violation of status did not result solely from a reduction to his course load that would have been within USCIS's power to authorize.  In addition to taking a reduced course load, Petitioner failed to complete his course of study by August 23, 2008, the program completion date indicated on his Form I-20.  Dkt. 18-2 at 8:25–9:4, 27:8–28:9, 62.  Indeed, Petitioner did not complete his course of study until December 15, 2017—more than nine years after he was required to do so.  *Id.* at 56.  And because he did not apply for a program extension prior to his program end date, *id.* at 27:23–28:22, he was in violation of status for this reason as well, *see* 8 C.F.R. § 214.2(f)(7)(i), and is not entitled to reinstatement of his student status under 8 C.F.R. § 214.2(f)(16).

Finally, Petitioner fails to demonstrate that denying him citizenship violates his constitutional rights, meaning the Court is prohibited from equitably adjusting his status.  Petitioner purports to bring a due process claim on the ground that he "suffered prejudice regarding his Application for Naturalization as a direct result of the government's failure to adequately adjudicate Petitioner's Application for Adjustment of Status."  Dkt. 5 ¶ 31.  While Petitioner fails to set forth the nature of or basis for this claim, he appears to contend that USCIS's decision to deny his naturalization application after initially (and erroneously) approving his adjustment of status in 2011 violated his due process rights.  *See* Dkt. 5-1 at 7 ("It is a violation of [Petitioner's] due process right to have his application for adjustment of status approved, but later restricted due to Defendants' own errors.").

1    The Ninth Circuit has held that if a plaintiff can show that immigration officials

2    "arbitrarily and intentionally" obstructed his citizenship application, then his right to due process

3    has been violated. *Brown*, 763 F.3d at 1150. This requires a plaintiff to demonstrate that

4    immigration officials were "deliberately indifferent to whether his application was processed,"

5    *id.*, "a greater level of culpability" than "gross negligence or recklessness." *Id.* at n.5. If a

6    plaintiff cannot show such a degree of culpability, then "he has not proved a constitutional

7    violation, and his citizenship claim must fail."[3] *Id.* at 1150.

8        Petitioner contends that the "facts of this case, which are not in dispute, are that

9    Respondents' affirmatively gave Petitioner erroneous information, and misrepresented the law,

10   when they sent him a letter dated August 29, 2011, telling him that he was eligible to adjust his

11   status *immediately* under the *wrong* category." Dkt. 19 at 5 (emphasis in original). He further

12   contends that this conduct "goes beyond mere negligence, this is official misrepresentation of a

13   material fact." *Id.* But Petitioner fails to demonstrate, nor does he even contend, that in

14   providing Petitioner with erroneous information, USCIS was deliberately indifferent to whether

15   Petitioner's application was processed. Indeed, he has come forth with no evidence to support

16   finding that USCIS's actions resulted from anything other than mistake.

17

18

---

19   ³ Petitioner cites *INS v. Hibi*, 414 U.S. 5, 8 (1973) for the proposition that "affirmative
     misconduct by a government official may justify estoppel against the government." Dkt. 19 at 5. But in
20   *Hibi*, the Court held that the government could not be estopped from denying a claim to citizenship even
     though it had knowingly failed to abide by the terms of an immigration statute permitting Filipino war
21   veterans to naturalize. *Hibi*, 414 U.S. at 8–9. This was true even though the government's error was
     "clear." *INS. v. Miranda*, 459 U.S. 14, 17–18 (1982). *See also Montana v. Kennedy*, 366 U.S. 308, 314–
22   15 (1961) (holding that the government could not be estopped from denying the citizenship of a petitioner
     whose mother was prevented from returning to the United States before his birth by the incorrect advice
     of an immigration officer). Here, USCIS also made clear error when it told Petitioner he was eligible to
23   immediately adjust his status to that of lawful permanent resident in a preference category to which he did
     not belong. But nothing in *Hibi* supports finding that this error is grounds for estoppel. Rather, *Hibi*
     supports finding the opposite.

He therefore has failed to demonstrate that denying him citizenship violates his constitutional rights, and the Court cannot equitably adjust his status, *nunc pro tunc* or otherwise. USCIS's Motion should be granted.

## IV.    CONCLUSION

For the foregoing reasons, USCIS's Motion for Summary Judgment, Dkt. 17, should be GRANTED,[4] and his application for naturalization should be denied.[5]

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[4] In his Petition, Petitioner asks the Court to "[o]rder that a hearing take place in this matter." Dkt. 5 at 8. While 8 U.S.C. § 1421(c) requires the district court to review the denial of a naturalization application "de novo," to "make its own findings of fact and conclusions of law," and, "at the request of the petitioner, [to] conduct a hearing de novo on the application," this does not preclude the Court from disposing of a case on summary judgment if it determines that "a statutory bar to meeting the requirements for naturalization exists." *Sabbaghi v. Napolitano*, C08-1641Z, 2009 WL 4927902, at *3 (W.D. Wash. Dec. 11, 2009) (citing *Chan v. Gantner*, 464 F.3d 289, 295–96 (2d Cir. 2006)). Because the Court concludes as much here, it need not engage in a hearing before granting USCIS's Motion.

[5] In his Petition, Petitioner also brings a claim for "Violation of the Administrative Procedures Act ('APA')[,]" stating "[t]he APA provides for judicial review only in the absence of an adequate remedy. The Government's refusal to apply appropriate relief in Petitioner's case is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law,' 5 USC § 702." Dkt. 5 ¶ 36. This unexplained inclusion of an APA claim in the Petition should not preclude the denial of Petitioner's naturalization application. Petitioner seeks *de novo* review of USCIS's decision under the provisions of the INA, meaning his purported APA claim is superfluous.

V.     <u>OBJECTIONS</u>

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **fourteen (14) days** of the date on which this Report and Recommendation is signed.  Failure to file objections within the specified time may affect your right to appeal.  Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed.  Responses to objections may be filed within **fourteen (14) days** after service of objections.  If no timely objections are filed, the matter will be ready for consideration by the District Judge on **June 24, 2022**.

Dated this 7th day of June, 2022.

S. KATE VAUGHAN
United States Magistrate Judge

REPORT AND RECOMMENDATION - 22